FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

00 APR 27 AM 9:56

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| NANCY GAYLE MASHBURN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL KEMPER LIFE ASSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

Civil Action No.

**ENTERED**

99-AR-0530-M   APR 27 2000

### MEMORANDUM OPINION

Before the court is defendant's motion for summary judgment.
Plaintiff, Nancy Gayle Mashburn ("Mrs. Mashburn" or "Plaintiff"),
alleges that defendant, Federal Kemper Life Assurance Company
("Kemper"), breached its contract with her ex-husband, Roland
Mashburn ("Mr. Mashburn"), when it denied coverage under his life
insurance policy.  Plaintiff also alleges that Kemper committed bad
faith, fraud, and breach of fiduciary duty.  For the reasons set
out more fully below, the court will grant Kemper's motion as to
all counts.

### Pertinent and Undisputed Facts

Plaintiff and Mr. Mashburn were divorced on January 22, 1996,
in St. Clair County, Alabama.  Under the terms of the divorce
decree, Mr. Mashburn was obligated to maintain life insurance in
the amount of $105,000, with plaintiff being the named beneficiary.



Subsequently, Mr. Mashburn canceled the coverage. Plaintiff filed in the Circuit Court for St. Clair County a petition to show cause why Mr. Mashburn should not be held in contempt. Prior to the hearing on the petition, however, the parties agreed that Mr. Mashburn would obtain $75,000 in coverage. The Circuit Court then entered an order stating that Mr. Mashburn could purge himself of contempt if he delivered the policies to plaintiff within 30 days.

At some point after Mrs. Mashburn filed her petition, Mr. Mashburn's attorney, Vernon Schmitt ("Schmitt"), spoke with Billie Holleman ("Holleman"), an insurance agent with Greenhalgh Insurance agency, in an effort to obtain coverage. Holleman had been referred by Bill Dean ("Dean"), a friend of hers who worked for State Farm. Dean had told her that the life insurance was needed to satisfy a divorce decree but that State Farm could not issue a policy because of Mr. Mashburn's slightly high blood pressure.

After the parties had agreed on $75,000 in coverage, Schmitt asked Holleman for a quote on a $65,000 policy.[1]   Holleman obtained a quote from Duke Insurance Brokers ("Duke").

On May 15, 1997, Holleman met with Schmitt and Mr. Mashburn in order to complete the application. Holleman asked Mr. Mashburn

---

[1]   Mr. Mashburn already had a $10,000 insurance policy through his employer, with plaintiff named as the beneficiary.

questions during this meeting and wrote down the answers that he gave her. Holleman and Mr. Mashburn then signed the application. After receiving a check for $74.00 from Schmitt as advance payment of the first premium, Holleman gave Mr. Mashburn a "conditional receipt," which contained no language binding coverage. The complaint makes no mention of an oral binder.

On May 30, 1997, Mr. Mashburn underwent a physical examination by Rick Robbins ("Robbins") of Portamedic. In connection with the examination, Robbins completed a medical questionnaire on which he indicated that Mr. Mashburn suffered from and took medication for high blood pressure. During that examination, Mr. Mashburn's blood pressure was taken three times. The results were 156/94, 150/92, and 148/92. Portamedic forwarded the medical questionnaire along with the report from his examination to Duke. Duke forwarded that information along with Mr. Mashburn's insurance application to Kemper's general agent, Financial Resource Group, which in turn submitted the information to Kemper. It is obvious that the physical examination and report was a part of the application process.

Kemper assigned Mr. Mashburn's application for life insurance to Ms. Andris Duffy ("Duffy") for underwriting. Duffy began reviewing the application on or about June 6, 1997. After noting

3

Mr. Mashburn's history of high blood pressure as indicated on his application, Duffy determined that medical records would be necessary and requested records from Dr. Joseph Germann, whom Mr. Mashburn had indicated to be his doctor in his original application.  On or about June 23, 1997, Duffy was informed that there were no medical records available from Dr. Germann's office concerning Mr. Mashburn.

On June 29, 1997, Mr. Mashburn was killed in an automobile accident.  Kemper was notified of the death.  Because Mr. Mashburn had made an initial premium payment of $74.20 and had been issued a conditional receipt, Duffy was required to continue to underwrite his application under Kemper's standard rules and practices.  On July 1, 1997, Duffy faxed a request for medical records to Dr. George Harris ("Dr. Harris"), a physician disclosed by Mr. Mashburn on the medical questionnaire completed by Robbins of Portamedic.  On or about July 8, 1997, Duffy received Mr. Mashburn's medical records from Dr. Harris.  The records from Dr. Harris revealed blood pressure readings of 144/100 and 177/110 on July 12, 1995.  Kemper's undisputed guidelines allow for historical blood pressures to be averaged up to two years in calculating the risk associated with a proposed insured.  When Duffy averaged the first two readings taken by Robbins along with the two from Dr. Harris in

4

1995, the average, according to her, was 157/93.[2]

According to Kemper's guidelines, a blood pressure of 157/93 for a 50 year old male resulted in 50 "debits."  Kemper's debit system is essentially a way of calculating the risk associated with insuring the applicant for life insurance.  Duffy explained in her uncontradicted affidavit that Mr. Mashburn's debits converted to a Table B which is more than twice the premium than the rate for which he had applied.

The records from Dr. Harris also revealed that in 1994, he had recommended to Mr. Mashburn that he discontinue his alcohol abuse.  Dr. Harris' notes indicate that at the time, Mr. Mashburn drank about a six pack of beer per day.  However, in response to the question on his application, "Have you ever been advised by a physician, psychiatrist, or psychologist to quit or reduce your alcohol use?," Mr. Mashburn had answered "No."

The conditional receipt that Mr. Mashburn had received from Holleman categorically stated: "No insurance will be provided under this receipt unless all requirements are first fulfilled exactly during the lifetime of the proposed insured." It then stated that

---

[2]  The court notes that when it averaged the four readings, it came up with 157/99.  This discrepancy is irrelevant for the purposes of summary judgment because the diastolic number is actually **higher** than the number calculated by Kemper.

the following items must be fulfilled in order for coverage to become effective:

> d.   All answers given in the application are true and complete;
>
> e.   The Proposed Insured is acceptable to the Company under its rules and practices, for the plan and amount applied for, without amendment, at the rate class applied for or a lesser premium, as of the date the Company receives all of its medical requirements.[3]

After looking at the records from Dr. Harris, Duffy determined that Mr. Mashburn's answer that he had never been advised to quit or reduce alcohol use was false and thus that provision "d" was not satisfied.  She also determined that because of Mr. Mashburn's blood pressure readings, he was not eligible for the rate for which he had applied and therefore, that provision "e" was not satisfied. On July 16, 1997, Duffy sent a letter to plaintiff informing her that under the terms of the conditional receipt, Kemper would not provide coverage on Mr. Mashburn.

### Summary Judgment Standard

Rule 56(c), F.R.Civ.P., provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

---

[3]   Only the two provisions relevant to this case have been quoted.

material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has emphasized that this language means exactly what it says: there must be a <u>genuine</u> issue of <u>material</u> fact, not merely some factual dispute. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510 (1986). What this standard means in practice is that "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249, 106 S.Ct. at 2511 (citing <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 88 S.Ct. 1575 (1968)).

On defendant's motion for summary judgment, the court must look at the evidence, construed in plaintiff's favor, to see if a jury could return a verdict for plaintiff. If so, defendant's motion for summary judgment must be denied. If, however, as a matter of law, a jury could not return a verdict for plaintiff, defendant's motion must be granted.

### I.  Breach of Contract

Kemper argues that there can be no breach of contract because a contract was never formed. It points to the language of the conditional receipt which makes the formation of a contract conditional on certain requirements being met, including conditions

7

"d" and "e."

Mrs. Mashburn argues, in response, that she should survive summary judgment: (1) because under § 27-14-7 of the Alabama Code, 1975, Kemper has to show that any misrepresentation by Mr. Mashburn in violation of condition "d" was "material," and that this is a jury question; and (2) because there are disputed issues of material fact with regard to whether Mr. Mashburn met condition "e." The court will address each argument in turn.

### A.  Alabama Code § 27-14-7

Mrs. Mashburn cites Alabama Code § 27-14-7 for the proposition that Mr. Mashburn's misrepresentation has to be "material" before Kemper can escape coverage. Kemper argues that this statute does not apply because a contract was never formed. Therefore, the first question to be decided is whether § 27-14-7 only provides a basis for rescission or whether it also comes into play in a determination of whether a contract was formed in the first place.

Because this is a diversity case and the court is dealing with applications of Alabama law to the undisputed facts, the court must defer to interpretations of an Alabama statute by the Alabama Supreme Court. Mrs. Mashburn cites First Financial Ins. Co. v. Tillery, 626 So.2d 1252 (Ala. 1993), for the proposition that a misrepresentation under Alabama Code § 27-14-7(a)(2) must be

8

"material."  However, <u>First Financial</u> involves a situation in which the insurer was trying to use a misrepresentation on an application to avoid coverage **after** a policy or contract of insurance had already been issued. <u>See also</u> <u>Henson v. Celtic Life Ins. Co.</u>, 621 So.2d 1268 (Ala. 1993), <u>Hess v. Liberty National Ins. Co.</u>, 522 So.2d 270 (Ala. 1988), and <u>State Farm General Ins. Co. v. Oliver</u>, 658 F.Supp. 1546 (N.D. Ala. 1987).  Also, many of the Alabama cases dealing with § 27-14-7 specifically use the words "rescind" and/or "rescission" when dealing with an insurer's attempt to avoid payment.  Furthermore, the language of the statute itself suggests that it only applies to contracts which have been formed.  Section (a) of the statute states:

> Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery **under the policy or contract** unless either:
> (1) fraudulent;
> (2) material either to the acceptance of the risk or the hazard assumed by the insurer; or
> (3) The insurer in good faith would either not have issued **the policy or contract**, or would not have issued **a policy or contract** at the premium rate as applied for, or would not have issued **a policy or contract** in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer... (emphasis supplied).

First, the language in section (a), that a misrepresentation "shall not prevent a recovery under the policy or contract,"

9

necessarily assumes that a contract or policy already exists.
Second, the verb tense of the phrase used repeatedly in subsection
(3), "would not have issued," clearly demonstrates that the statute
applies only to situations in which contracts have already been
formed.  Therefore, this court finds that this section only applies
to cases in which contracts have been formed.[4]

This necessarily leads to the critical question of whether a
contract was actually formed between Kemper and Mr. Mashburn.  The
court is convinced that <u>Gillilan v. Federated Guaranty Life Ins.
Co.,</u> 447 So.2d 668 (Ala. 1984), answers this question.   In
<u>Gillilan</u>, the Alabama Supreme Court held:

> As a contract, a life insurance policy is not complete
> until the minds of the parties have met and they arrive
> at an understanding of the terms of the agreement, i.e.,
> the proposals of one party being accepted by the other,
> and the risk does not attach until the conditions
> precedent have been fulfilled.  An application for
> insurance is a mere offer which does not ripen into a
> contract unless, and until, it is accepted by the insurer

<u>Id.</u> at 671-672 (internal citations omitted).

Conditions precedent are typical in the negotiations of many
contracts.  The basic concept is that a contract does not come into

---

[4]      The court notes that it did not consider certifying this question
to the Alabama Supreme Court, not only because of this court's high comfort
level with its own understanding of the Alabama law here being discussed, but
because defendant's alternative argument is sufficient to justify granting
summary judgment.  <u>See</u> Section I.B. of this opinion.

existence until the enumerated conditions occur or are affirmatively performed. The above language from <u>Gillilan</u> makes it clear that when there are conditions precedent, an application for life insurance is merely an offer and does not create a contract between the applicant and the insurer until those conditions are met.

The conditional receipt in this case contained this provision: "No insurance will be provided under this receipt unless all requirements are fulfilled exactly during the lifetime of the proposed insured." It then goes on to say: "The following must first be fulfilled for insurance to start," and then enumerates conditions "a" through "f." The above quoted language makes it clear that the listed conditions are conditions precedent to the formation of a contract. In effect, Kemper's acceptance of Mr. Mashburn's "offer" to form a contract of insurance was contingent upon those conditions being satisfied. If they were not **all** satisfied or expressly waived, there was no acceptance, and, therefore, no contract. <u>See also</u> <u>Reserve Life Ins. Co. v. Haster</u>, 500 So.2d 1052, 1054-1055 (Ala. 1986) (citing with approval <u>Gillilan</u> and holding that no insurance contract had been issued).

In this case, two conditions were not satisfied: "d" and "e." One would be enough. As for condition "d," Mrs. Mashburn argues

that there was no misrepresentation because being told to discontinue alcohol **abuse** is not the same as being told to reduce alcohol **use**. This argument is flawed because the logical principle of the-greater-includes-the-lesser controls; certainly stopping alcohol abuse includes reducing one's alcohol **use**. Thus, the court finds that condition "d" was not met.

### B.  Condition "e"

Even if the court found that Mr. Mashburn had not made a misrepresentation that precluded the fulfilling of condition "d," or if the court found that § 27-14-7 introduced the factor of "materiality" into the equation, Kemper's motion for summary judgment is due to be granted because Kemper can show, alternatively, that condition "e" was not met.

Kemper points out that after Duffy looked at the medical records from Dr. Harris and calculated Mr. Mashburn's average pressure along with the corresponding "debits," she determined that Mr. Mashburn was not qualified for the insurance premium and rate for which he had applied. Thus, Kemper concluded that it was not obligated to provide coverage because condition "e" was not satisfied.

Once again, the court finds that <u>Gillilan</u> controls.   In

Gillilan, the contract stated that the insurance would take effect if, after receipt of the application, the company, after investigation, was satisfied that the proposed insured was insurable and was entitled under the company's rules and standards, to insurance on the plan and for the amount applied for at the company's published rates. Because the underwriter determined that the proposed insured was not insurable at the rate for which he had applied, the court agreed that the condition precedent was not fulfilled. See Gillilan, 447 So.2d at 672-673.

Mrs. Mashburn does not dispute the reasoning of Gillilan on this point but rather argues that there is a disputed issue of material fact as to whether Mr. Mashburn was actually eligible for the rate for which he applied. In essence, Mrs. Mashburn is arguing that the blood pressure readings were not calculated appropriately. First, she points out that although three blood pressure readings were taken by Robbins of Portamedic, only the first two were calculated.[5] Thus, Mrs. Mashburn argues that Mr. Mashburn's average blood pressure reading should have been 151.1/92.6 instead of 153/93.[6] However, Kemper argues that the

---

[5] The readings were 156/94, 150/92 and 148/92, respectively.

[6] The court's calculation shows that the actual average of the three readings is 151.33/92.66. However, this discrepancy is immaterial for the

difference between the average of the first two and the average of all three is irrelevant because the ultimate average upon which Kemper determined that Mr. Mashburn was not eligible included blood pressure readings from Dr. Harris in 1995.

Mrs. Mashburn responds by calling into question the timing surrounding the use of these prior readings. Although she does not dispute that Kemper's internal underwriting policy allows for historical blood pressures to be averaged up to two years, Mrs. Mashburn questions **when** Kemper looked at those readings. The implication is that if Duffy did not consider the 1995 readings until **after** July 12, 1997, they should not have been considered at all because they would have been outside the two year window. If only the readings from Portamedic were calculated, Mr. Mashburn would have had 25 "debits" instead of 50.

However, unless Mrs. Mashburn's mere speculation is considered to be evidence, there is no evidence that Kemper is lying about when it received the medical records. There is no proof of fraud. Duffy's uncontradicted affidavit states that she received the records on or about July 8, 1997. The records from Dr. Harris

---

purposes of summary judgment. Furthermore, the court notes that the difference between the average of the two readings and average of the three readings is not material because the "debits" are the same for either average.

indicate that Duffy faxed the request to Dr. Harris on July 1, 1997, and that his office compiled the records on July 2, 1997, and mailed them that same day.  Thus, it is only logical to assume that the records were received by July 8.  In sum, the court finds that Mrs. Mashburn has produced no evidence that creates a disputed issue of material fact with regard to whether the blood pressure readings from 1995 were improperly considered.  Therefore, because condition "e" was not met, there again was no contract.  Kemper could reject Mr. Mashburn's application, as it did, and Kemper's motion is due to be granted.

## II.  Bad Faith

In order to succeed on a bad faith claim, a difficult undertaking, a plaintiff must first show the existence of an insurance contract between the parties and a breach of that contract.  See National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1361 (Ala. 1982)(citations omitted).  Because there was no insurance contract here, Mrs. Mashburn cannot make a bad faith claim, and Kemper's motion is due to be granted as to that claim.

## III.  Fraud

Mrs. Mashburn does not contest Kemper's motion as to her fraud claim because she acknowledges that under Alabama law, any claim that Mr. Mashburn may have had for fraud did not survive his death.

15

See <u>Miller v. Dobbs Mobile Bay, Inc.</u>, 661 So.2d 203, 205 (Ala. 1995)(citing § 6-5-462, Ala. Code 1975, and holding that any claim based on a fraud perpetrated on the deceased would not survive in favor of his personal representative).  Thus, the court will grant defendant's motion as to the fraud claim.

### IV.  Breach of Fiduciary Duty

Mrs. Mashburn does not contest Kemper's motion for summary judgment as to her breach of fiduciary duty claim. Thus, the court will grant defendant's motion as to that claim.

16

## Conclusion

This court joins Mrs. Mashburn in wondering whether Kemper would have actually issued its insurance policy if Mr. Mashburn had not been killed.  It is entirely possible that Kemper flyspecked the insurance application and the conditional receipt in a way it would not have flyspecked it if Mr. Mashburn had been alive.  But, the express language that created the contingencies was chosen while Mr. Mashburn was alive, and he was bound by that language, language which Kemper could exploit with impunity even after his death.

A separate and appropriate order will be entered.

DONE this __27th__ day of April, 2000.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

17